AMERICAN CREDIT CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
American Credit Corp. v. Commissioner
Docket No. 5339-67.
United States Tax Court
T.C. Memo 1973-33; 1973 Tax Ct. Memo LEXIS 251; 32 T.C.M. (CCH) 122; T.C.M. (RIA) 73033; February 13, 1973, Filed *251 Held, certain debts acquired by petitioner on March 31, 1962, in a Type C reorganization under sec. 368(a) (1) (C) [1] were not wholly worthless, but only partially worthless when acquired. Petitioner acquired the transferor's basis in the debts under sec. 362(b) and properly deducted the unrecovered amounts of indebtedness under sec. 166 in its taxable years ending August 31, 1962, and 1963. Held, further, certain stock acquired in the above reorganization became completely worthless at some time prior to petitioner's acquisition thereof; therefore, petitioner's subsequent deductions for losses on worthless stock were properly disallowed by respondent since sec. 165 provides for such deductions only in the taxable year in which the stock became worthless. 2 Sidney B. Gambill and Carl E. Glock, Jr., for the petitioner. Steve C. Horowitz, for the respondent. HOYT
MOMORANDUM FINDINGS OF FACT AND OPINION HOYT, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years ending August 31, 1960, 1962, and 1963, in the amounts of $4,379.42, $364,879.22, and *252 $430,503.59, respectively. The issues for decision are whether petitioner's predecessor, Home Finance Group, Inc., is entitled to deductions for bad debts under section 166(a) (1) and losses from worthless stock under sections 165(a) and (g) in the taxable years ending August 31, 1962 and 1963. The deficiency determined with respect to the taxable year ending August 31, 1960, results from the respondent's disallowance of a portion of the carryback of a claimed net operating loss incurred in the fiscal year ending August 31, 1963. Whether such a loss occurred to the extent of the carryback disallowed depends upon our determination with regard to the latter year, and the parties have agreed that the matter of the 1960 deficiency will be resolved on the Rule 50 computation. 3 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. Home Finance Group, Inc. (hereinafter often referred to as "Home") was incorporated under the laws of the State of North Carolina on June 24, 1946. On December 31, 1964, Home merged with American Discount Company, a Georgia corporation. Home survived *253 the merger and changed its name to American Credit Corporation, the petitioner herein. At the time the petition was filed, and during the years in question, Home (now American Credit Corporation) maintained its executive offices in Charlotte, North Carolina. Its Federal income tax returns for the years involved were filed with the district director of internal revenue at Greensboro, North Carolina, on the basis of an accrual method of accounting and a fiscal year ending August 31. By 1961 the business of Home included the operation of the following wholly owned subsidiaries: (a) Automobile Finance Subsidiaries - consisting of 49 separately incorporated offices located in the States of Alabama, Kentucky, 4 North Carolina, Tennessee, Virginia, and West Virginia. The automobile finance subsidiaries made loans to dealers to finance the purchase of new and used cars, to purchase retail installment obligations taken by dealers on the sale of cars, and to make direct loans on new and used automobiles. By August 31, 1964 the number of automobile finance subsidiaries had increased to 56. (b) Consumer Loans Subsidiaries - consisting of 66 separately incorporated offices located in the *254 States of Georgia, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia. These subsidiaries were in the business of making small personal loans which were regulated by state law. The amounts loaned were limited by local law and the loans were usually without collateral. By August 31, 1964 the number of consumer loan subsidiaries had increased to 105. (c) Insurance Subsidiaries - consisting of two fire and casualty subsidiaries, South State Insurance Company and Twin States Insurance Company, and two life insurance companies, Carolina Central Life Insurance Company and East Coast Life Insurance Company, whose operations were principally credit life and accident and health coverage. 5 (d) Advertising Subsidiary - consisting of one separate corporation under the name of Home Advertising Agency. Except for bookkeeping and reporting services performed at the various subsidiaries and the services of a manager at each subsidiary office, financial accounting and administrative services are performed at Home's executive offices in Charlotte, North Carolina. The same individuals serve on the boards of directors of both the parent company and its subsidiaries. With minor *255 variations, the officers of the parent also serve as officers of the subsidiaries. Prior to 1961 Home had never engaged in the factoring business. Commercial factoring consists of factoring accounts receivable, making advances to factored companies, and making other loans and advances to businesses, generally secured by chattel mortgages on equipment or by assignment of accounts receivable or inventories. Commerical factoring is generally broken down into three categories: (1) Old line factoring which involves the purchase of accounts receivable under a factoring contract whereby the factor provides to the client both credit and the servicing of accounts receivable purchased without recourse. For its services the factor charges a commission. (2) Accounts 6 receivable financing, in which loans to clients are secured by accounts receivable. Sometimes such loans are secured by additional collateral, such as pledges of inventory, equipment, furniture or equipment. (3) Commercial financing, in which funds are advanced and secured by liens on the large equipment of manufacturers. Generally speaking, the clients of a commercial factoring business are unable to obtain loans from banks *256 due to low credit standing. In some instances, however, a client with good bank credit standing will sell invoices to a factoring business in order to avoid the necessity of maintaining a credit or collection department. Prior to 1961, Home's management had discussed the need for further diversification by entering the commercial factoring business and thus becoming a general financing business. After investigating the possibility of purchasing a going factoring business, Home decided to enter the commercial factoring business on its own and inquired through banking connections as to a qualified person to employ to start and manage such a business. R. W. Griffith was recommended to Home by a banking 7 connection in New York and by Alan Rodgers, an acknowledged expert in commercial paper and factoring. Griffith had graduated from college in 1930. One of his first jobs was with Dun & Bradstreet, Inc., and this introduced him into the credit business. He worked for National Credit Office, a division of Dun & Bradstreet, for several years and then became connected with J. P. Stevens and Company as a supervisor in its credit and financial management department. While he was with *257 Stevens, Stevens acquired an old and well-established factoring company, John P. McGuire and Company. Griffith became prominent in the factoring business. His credit background included specialization in yarn, knitting and weaving industries, converters of gray goods, industrial fabrics, fibre-glass fabrics, and manufacturers of curtains and draperies. Among other credit organizations, he had been a member of the New York Credit and Financial Management Association and had been a former president of the Yarn Credit Group. Home's president called Griffith in May or June of 1961 and Griffith went to Charlotte to talk with Home's representatives. He was told that Home wanted to diversify its business by adding a commercial factoring business. He was employed by Home for that 8 purpose, leaving a lucrative job in New York. He arrived in Charlotte to take up his work on July 10, 1961. This was followed by Home's organization of a new subsidiary, Home Factors Corporation, on July 28, 1961, for the purpose of entering the commercial factoring business. When Griffith arrived with his family in Charlotte, he found that he had to start the commercial factoring business "from scratch." *258 After he had obtained a corporate charter, he commenced preparing documents for use in the business, forms and corporate resolutions for clients to execute, and many internal forms. The new subsidiary, Home Factors, incurred expenses of $6,994.66 during the period from July 28, 1961 through August 31, 1961, for office expenses, forms, licenses, subscriptions, rent, etc., but had not obtained a customer. Shortly thereafter, Home Factors incurred additional expenses of $1,418.75, but became a dormant corporation about the time Home entered into an agreement, hereinafter described, to purchase another factoring business on September 8, 1961. None of the above expenses included Griffith's salary, which was paid directly by Home. 9 Standard International Corporation (hereinafter sometimes referred to as "Standard") was organized as an Ohio corporation in 1955 by a group including John Bolton, Sr. and Daniel Hogan.It was formed for the acquisition of a substantial publishing company in Cincinnati, Ohio. Thereafter, it proceeded to acquire various other companies, most of which were well-established. It grew to be a very large corporation with approximately 20 major divisions including *259 manufacturing, merchandising, surgical products, and publishing businesses, with annual sales exceeding $100,000,000. Hogan, the president of Standard, looked for various acquisitions which he felt would add stature and earnings to Standard. Through a connection with J. N. Rawleigh, a long-time friend, he was advised that a substantial block of stock in J. N. Rawleigh Company, a rapidly growing and highly successful commercial factoring business, was available. Subsequently, in 1958, Standard acquired more than half of the shares of J. N. Rawleigh Company of High Point, North Carolina. The J. N. Rawleigh Company (hereinafter referred to as "Rawleigh-Parent") was incorporated as a Delaware corporation on November 18, 1959. Rawleigh-Parent owned 100 percent of the stock of four old-line factoring corporations operated as J. N. Rawleigh Company of 10 North Carolina, J. N. Rawleigh Company of Florida, J. N. Rawleigh Company of Kentucky, and J. N. Rawleigh Company of South Carolina. These subsidiaries were incorporated on December 18, 1958, June 20, 1958, an undisclosed date in 1960, and December 17, 1958, respectively. Rawleigh-Parent also owned 100 percent of the stock of three *260 other subsidiaries, namely: (1) Piedmont Customer Service, Inc., which operated a consumer factoring activity, along with a charge-plan business involving the purchase of accounts receivable from various retail stores, (2) Piedmont Assets, Inc., which engaged in the consumer factoring business dealing principally with the leasing of communications and manufacturing equipment, and (3) Piedmont Building Corporation, which owned the land and building in which Rawleigh-Parent had its offices in High Point, North Carolina. Piedmont Customer Service, Inc., and Piedmont Assets, Inc. were incorporated on January 19, 1959, and December 12, 1958, respectively. While the Rawleigh Companies had been profitable from the beginning, Standard's return on its investment was smaller than on its investments in other kinds of businesses. Furthermore, Standard's officers felt that 11 they were not receiving complete information with regard to the operations of the Rawleigh companies from James N. Rawleigh. The latter was president and treasurer of Rawleigh-Parent and completely dominated the companies' affairs. Standard did not have its own financial officers in the Rawleigh companies, and James Rawleigh *261 rarely supplied Standard with anything more than audit statements. In addition, Standard did not have the management talent to replace James Rawleigh. For these reasons Standard became wary of its investment in Rawleigh-Parent and decided to dispose of its interest in the company. Hogan, the president of Standard, had discussed the sale of Standard's Rawleigh-Parent shares with two companies, who sent representatives to High Point to examine the Rawleigh-Parent affairs. They concluded that J. N. Rawleigh was unacceptable as a potential business colleague, that he completely dominated the affairs of Rawleigh-Parent, and that he was unfriendly. Both of the potential purchasers became disinterested in an acquisition, and Standard felt this was due to the uncooperative attitude of J. N. Rawleigh, on whom the purchasers would have to rely for management. 12 The First National City Bank of New York was one of Standard's lead banks for its own operations. It was Hogan's custom to stop in the bank and discuss the company's business matters when he was in New York. Shortly prior to the end of August 1961, Hogan discussed the problems Standard was having with its investment in Rawleigh-Parent *262 with Julian McCall, who was a vice president of the bank in charge of the southeastern division, and advised him of Standard's interest in selling its Rawleigh-Parent stock. McCall was familiar with the affairs of the Rawleigh companies. The Bank had lent Rawleigh-Parent a million dollars or more and was in effect the lead bank of the group of banks that were lending money to Rawleigh-Parent. During this conversation McCall contacted Edward Burnside, Jr., president of Home, who thereupon expressed interest in the possibility of acquiring a factoring business (later disclosed to be Rawleigh-Parent) in Home's area of operation. A meeting was arranged between the representatives of Standard and Home to take place several days later, and in the interim, on or about September 1, 1961, the bank officials sent certain financial statements of Rawleigh-Parent to Home. Said financial statements 13 consisted of the annual reports of Rawleigh-Parent and its subsidiaries for the years ended March 31, 1960, and March 31, 1961, and the audit report for the year ended March 31, 1961. After Burnside received the financial statements, he had William J. Williams, a vice president of Home, examine *263 them and confer with Robert W. Griffith in preparation for the scheduled meeting with the Standard representatives. Williams, a certified public accountant since 1949, had been associated with an accounting firm, Haskins and Sells, in Charlotte, North Carolina, for about five years when he was assigned by Haskins and Sells to do Home's audits for the fiscal years ending August 31, 1947 through 1949. After completion of his audit for the fiscal year ended August 31, 1949, he was employed by Home. At Home he took charge of all accounting. In 1950 he was elected secretary of the Company and at some time prior to 1960 he was elected a vice president and secretary. He retained the latter titles through the taxable years in issue. He continued to be in charge of Home's accounting records during the years in question. Since Williams joined Home, he has played an active part in Home's acquisition of about 75 companies, most of which have been in the consumer loan field. 14 The following consolidated figures were set forth in the annual reports which were furnished by Standard: Year Ended 3/31/1959
Year Ended 3/31/1960
Year Ended 3/31/1961 OPERATIONS
Accounts Receivable Purchased
$25,833,895
$37,954,680
$46,070,182 [1]
Gross Income
705,090
1,206,130
1,753,928
Operating Expense
273,629
611,350
914,582
Interest
123,033
295,876
498,908
Taxes and Other Charges
203,460
177,293
205,684
Net Income
104,968
121,611
134,754
FINIANCIAL POSITION
Working Capital
1,367,345
2,551,356
3,256,826
Current Ratio
1.38:1
1.50:1
1.36:1
Long Term Funds
643,200
1,270,000
1,760,000
Stockholders' Equity
890,310
1,576,056
1,650,036
Number of Shares Year-end
78,453
130,606
135,411
Earnings Per Share
1.3380
.9311
.9951
Return on Stockholders' Equity
11.79%
7.72%
8.17%
*264 15 The condensed consolidated balance sheets of Rawleigh-Parent and its subsidiaries at March 31, 1961 and 1960 were as follows: March 31, 1961
1960
Current Assets
Cash
$1,133,655
$459,885
Accounts and Notes Receivable - Net
11,142,402
7,088,484
Prepaid Expenses
93,648
65,034
$12,369,705
$7,613,403
Current Liabilities
$8,114,000
$4,191,000
Subordinated Debt - Current
265,000
40,000
Amounts due Clients Pending Collection
633,369
718,510
Accrued Expenses and Other Payables
48,716
49,841
Provision for Income Taxes
51,794
62,696
$9,112,879
$5,062,047
Net Working Capital
$3,256,826
$2,551,356
Other Assets
143,577
131,441
Fixed Assets - Net
163,421
142,261
Deferred Charges
40,601
31,026
$3,604,425
$2,856,084
Less: -
Deferred Income
$194,389
10,028
Non-Current Senior Debt
250,000
Non-Current Subordinated Debt
1,510,000
1,270,000
$1,954,389
$1,280,028
Stockholders' Equity
$1,650,036
$1,576,056 16 The Federal income tax returns of Rawleigh-Parent and its subsidiaries were not examined *265 by Home's representatives in connection with the scheduled conference. For its taxable year ended March 31, 1958, Rawleigh-Parent reported taxable income in the amount of $110,419.07. The tax returns of Rawleigh-Parent and its subsidiaries for the years ended March 31, 1959 through March 31, 1961, reported the following taxable income: Year Ended March 31 1959
1960
1961
Rawleigh-Parent
$131,175.49
$25,009.63
$7,458.67
J. N. Rawleight Co. (North Carolina)
17,191.02
70,576.66
22,815.23
J. N. Rawleigh Co. (Kentucky)
3,168.10
5,650.98
J. N. Rawleigh Co. (Florida)
19,076.75
20,127.47
27,193.26
J. N. Rawleigh Co. (South Carolina)
1,336.54
15,678.38
21,283.64
J. N. Rawleigh Co. (Virginia)
1,152.92
12,952.41
(4,647.47)
Piedmont Assets
3,837.06
2.04
27,279.24
Piedmont Customer Service, Inc.
2,330.58
1,419.51
(15,702.88)
The financial statements for March 31, 1961, revealed that the commercial factoring subsidiaries held $6,887,908 and $397,500 in face amount of accounts receivable and notes receivable, respectively, with an allowance for losses of only $112,971, and that the allowance for losses with respect to the $3,056,299 in accounts receivable and $22,336 in notes receivable held by the retail factoring 17 subsidiary, *266 Piedmont Customer Service, Inc., amounted to only $35,065, making a total of $148,036 in allowance for losses on the consolidated balance sheet. [2] *267 No allowance for losses was provided with respect to the $949,256 in accounts receivable held by Piedmont Assets. With respect to these allowances, the accountants, Lindsay Squires & Everett, made the following statement in their March 31, 1961 report: We discussed the allowances for discounts and losses with management who is of the opinion that these allowances for discounts and losses are sufficient to absorb such discounts and losses. In their review of the financial statements, Williams and Griffith were "disturbed" by the following statement contained therein, which indicated to them that the 18 Rawleigh companies' management may not have been conservative enough with regard to the amounts set aside as "allowances for losses" for Piedmont Customer Service, Inc.: The accounts of the retail factoring subsidiary [Piedmont Customer Service, Inc.] were aged by the management at cycle closing dates in April, 1961 on the basis of recency of collection. The ageing disclosed the following: 0 to 90 days
$2,240,772
90 to 180 days
300,286
180 to 270 days
60,175
270 days and over
429,237
Total Receivables at Cycle Closing Dates
3,030,470
At *268 no time during the negotiations for Home's purchase of an interest in the Rawleigh companies did Home audit or examine the books and records, operations, or, in particular, the above-mentioned accounts receivable. Only the annual stockholders' reports for the years ending March 31, 1960 and 1961, and the accountant's certified audit report for the year ending March 31, 1961, were examined by Home. During the negotiations which took place in early September of 1961, Griffith had a report from Dun & Bradstreet, dated February 14, 1961, concerning the Rawleigh companies. This report read, in part, as follows: 19 BANKING Accounts are maintained at three local and forty-two out-of-towns where unsecured accommodations aggregating a low seven-figure amount have been granted. Bank credit is available in the amounts in excess of $6,250,000. Medium to high seven-figure amount currently owing. Company also sells portion of unsecured paper to commercial paper buyers with moderate seven-figure amount currently outstanding. Loans used steadily and handled satisfactorily. Aggregate balances range from high six to low seven-figures with relations satisfactory. CURRENT On February 9, 1961, *269 J. N. Rawleigh, Jr., President & Treasurer, said gross income thus far in current fiscal year (to end March 31) is approximately 35% ahead of that obtained in like period of previous year and that operating or net income is up about 25%. Statement later than March 31, 1960 unavailable, although Rawleigh furnished the following figures: cash a little over $1,000,000, notes and accounts receivable (net) $10,000,000, prepaid expenses $110,000, investments in subsidiaries not consolidated a little over $130,000, fixed assets $146,000, and deferred charges $33,000. Liabilities confined to notes payable $7,800,000, serial debentures due in current year $40,000, amounts withheld from clients pending collection of receivables $500,000, normal operating accruals and provision for taxes. Company had deferred income of $128,000 and senior funded debt (due 1965) $250,000. In addition, other non-current debt consisted of serial debentures (due March, 1962) $40,000, subordinated notes (due November, 1964) $1,000,000, and subordinated notes (due 1961) $230,000. Net worth had increased to about $1,625,000. Finances continue in order. 20 FINANCE This concern succeeded a similar established *270 operation which dates from 1948.Volume has increased steadily with retention of earnings allowing for considerable growth. * * * The company is in a financial position to move forward and the financial picture has been strengthened somewhat. Net worth increased almost $700,000 during past year and subordinated funds have more than doubled. Total funds available increased more than $3,500,000. Also, owners of $540,000 of the company's convertible debentures agreed to convert their holdings to common stock during 1969. This enabled the company to negotiate a $1,000,000 subordinated note and will permit future borrowings in this category. OPERATION Services: Company operates both as a holding and operating company. As a holding company, owns all of the stock in three other factoring companies and stock in three other companies. As an operating company, acts as operating company, acts as a factor, factoring accounts receivable and financing merchandise purchases for manufacturers, merchant wholesalers and retail businesses. Subject assumes credit risk of accounts receivable of its client and takes responsibility of collection of accounts with accounting on a discount basis. Reserve, *271 for use of which subject concern pays interest, is accumulated for each client. Specializes in furniture and textile accounts, although other lines are handled. 57 employees. Territory covers North Carolina, South Carolina, Virginia and Florida. Terms range from 10 to 60 days. Activities are fairly steady throughout the year. * * * 21 On the prearranged date, the conference planned between the representatives of Standard and representatives of Home took place in Charlotte, North Carolina. [3] Hogan and Gale Deam, vice president of Standard, represented Standard at the conference; Home was represented by Williams (Home's principal negotiator), J. E. Burnside, Jr., and Robert W. Griffith. The conference lasted approximately one and one-half days. During this conference the parties reached a tentative agreement that a merger of some sort would be effected, and that a contract would be written up in the near future. At the conference, the parties *272 compared the market value and the book value of the shares, the return on assets, and the earnings per share of Home and the Rawleigh companies. They also examined the historical growth in earnings per share of each company. The shares of both companies were selling over the counter; the over-the-counter selling price of Rawleigh-Parent's shares was then approximately $18 per share and the price of Home's shares was approximately $13 per share. They observed that the 22 book value of the Rawleigh shares was $12.36 per share and the book value of Home's shares was approximately $5 per share. Based on all of these factors, the parties arrived at an exchange ratio of 1-1/2 shares of Home for one share of Rawleigh. Hogan prepared a short memorandum setting forth the points tentatively agreed upon. Shortly thereafter, a proposed agreement was drafted by the attorneys for the two companies. The agreement, which was executed by the parties on September 8, 1961, read in pertinent part as follows: PURCHASE AND SALES AGREEMENT THIS AGREEMENT made this 8th day of September, 1961, between HOME FINANCE GROUP, INC., a North Carolina Corporation with its principal office and place of business *273 in Charlotte, North Carolina, (hereinafter called "Home"), J. N. RAWLEIGH COMPANY, a Delaware corporation with its principal office and place of business located at High Point, North Carolina, (hereinafter called "Rawleigh"), and STANDARD INTERNATIONAL CORPORATION, an Ohio corporation with its principal place of business in Mount Healthy, Ohio, (hereinafter called "Standard"). WHEREAS, Home desires to acquire by merger all of the business and assets of Rawleigh upon the terms and conditions hereinafter set forth, and WHEREAS, Standard, as the principal stockholder of Rawleigh, desires to effect such a transaction, 23 NOW, THEREFORE, the parties represent and agree as follows: 1. (a) Home is a corporation duly organized and existing under the laws of North Carolina, its authorized, issued and outstanding common capital stock consisting of the following: Authorized 3,000,000 Shares Issued and Outstanding 1,701,934 Shares There are no outstanding warrants, options or conversion rights existing with reference to said capital stock. * * * 2. (a) Rawleigh is a corporation duly organized and existing under the laws of Delaware, its authorized, issued and outstanding capital stock consisting *274 of: Authorized 200,000 Shares of Common Issued and Outstanding 135,448 Shares of Common * * * (b) Rawleigh has the following wholly-owned subsidiaries which are legally organized and existing under the laws of the respective states set forth below, and with the principal places of business as specified below: 24 Name of Subsidiary
State of Incorporation
Principal Place of Business J. N. Rawleigh Company
North Carolina
High Point, N.C.
J. N. Rawleigh Company
Florida
Sarasota, Florida
J. N. Rawleigh Company
Kentucky [4]
Louisville, Ky.
P.C.S., Inc.
North Carolina
High Point, N.C.
Piedmont Assets, Inc.
North Carolina
High Point, N.C.
Piedmont Building Corporation
North Carolina
High Point, N.C.
All of the issued and outstanding stock of each of said subsidiaries is duly paid, non-assessable and legally issued. * * * (e) Subject to possible adjustments in reserves for losses hereinafter provided, the report attached hereto as Exhibit B fairly reflects the financial condition *275 of Rawleigh as at March 31, 1961, and the results of its operations for the period ending March 31, 1961, in accordance with generally accepted accounting practices and principles. 3. (a) Standard is a corporation duly organized and existing under the laws of Ohio, with its principal place of business in Mount Healthy, Ohio. Standard is the owner of 72,415 shares of the common capital stock of Rawleigh, free and clear of all encumbrances. Standard has options to purchase 22,711.5 shares of the common capital stock of Rawleigh, and at the closing will have exercised said options in full. Standard will at the closing have the right to transfer clear title to such shares in accordance with the merger agreement contemplated herein, free and clear of all encumbrances, and in compliance with all applicable laws and corporate authority. 25 * * * 4. Home and Rawleigh mutually covenant and agree that as soon as practicable the properly authorized representatives of Home and Rawleigh will agree upon the terms of a merger agreement in accordance with the respective laws of Delaware and North Carolina, appropriate in the opinion of their respective counsels, to effect the merger of Rawleigh *276 into Home in accordance with the terms of this agreement. Standard agrees to take all reasonable action to cause Rawleigh to agree upon the terms of said merger agreement, as provided herein, and to take the necessary action to effect said merger. 5. Effective as soon as practicable after the execution of this agreement by the duly authorized representatives of the parties hereto, Home shall assume the actual management of Rawleigh through such of its representatives as Home shall designate. Home shall keep Standard reasonably informed as to the condition of the business from time to time and shall have the authority to make operating decisions in the regular course of business. Home agrees to confer with Standard prior to putting into effect any major policy decisions but shall have the authority to make such decisions in the event of a disagreement with Standard. Home agrees to devote its best efforts to the management and operation of Rawleigh during the period ending on the closing date, including but not limited to providing adequate supervision and personnel for the collection of past due consumer credit and factoring accounts, at Rawleigh's expense (excluding any allocation *277 of general home office overhead of Home). Except as hereinafter provided, Home shall not be responsible during said period for any losses incurred in the operating of said business while exercising good faith. Home, in the exercise of its discretion, shall have the right to utilize the services of such collection agencies and outside personnel as it deems advisable, including Home subsidiaries, and the reasonable direct cost of such services 26 shall be an expense of Rawleigh. Rawleigh and Standard agree that during the period of the operation of Rawleigh by Home no dividends will be paid by Rawleigh and no bonuses or salary increases will be authorized for its personnel employed by Rawleigh as of the effective date of this Agreement; provided, however, Rawleigh shall have the right to pay such dividends as have heretofore been declared but not paid. 6. Home agrees to use its best efforts in assisting Rawleigh in obtaining adequate bank lines or other short-term financing to conduct its business, but shall be under no legal obligation to do so, and shall not be liable during the period of its operation for any losses incurred in the operation of the business because of insufficient *278 shortterm financing. Home shall devote its best efforts to the continuation of the factoring business but shall have the right to terminate contractual arrangements with any one or more clients for reasons of credit exposure or unprofitability. Home shall have the right, but not the obligation, to discontinue and commence liquidation of all or any part of the consumer credit business operated by Rawleigh or its subsidiaries at any time. All losses on consumer credit business acquired prior to January 1, 1962, shall be taken into account in determining the adequacy of reserves and the necessary charge-offs as of March 31, 1962. Any consumer credit business acquired on or after January 1, 1962, shall be the responsibility of Home, and neither the profit nor loss shall be taken into consideration in computing the purchase price as at March 31, 1962, as hereinafter provided. Provided, however, that if Home elects to liquidate the consumer credit business prior to January 1, 1962, as herein provided, then all profit or loss from any business necessarily acquired thereafter, or which is in the process of liquidation, shall be taken into account as profit or loss, as the case may be, *279 in computing the purchase price as of March 31, 1962. 27 7. At the time of the closing, Standard shall deliver, or cause to be delivered, to Home, properly endorsed for transfer and with the transfer stamps affixed and cancelled, certificates representing common capital shares of Rawleigh in an aggregate of not less than 67% of the then total number of shares of the issued and outstanding capital stock of Rawleigh. Standard agrees that it will, on or before the closing date, exercise its option to purchase 22,711.5 shares of said capital stock which shall be included in the tender provided for herein. Standard further agrees to devote its best efforts to causing all other outstanding options to be exercised, including options which under their present terms could not be exercised by the closing date.Standard agrees that as of March 31, 1962, simultaneously with the arrangement by Home for substitute financing, it will cause $1,000,000 principal amount of 9% subordinated notes, presently an obligation of Rawleigh, to be paid off or otherwise eliminated from the balance sheet. Rawleigh agrees to repay as of March 31, 1962, certain pension funds of $600,000 in debt or preferred stock, *280 as the case may be, plus any premiums and accruals. Home agrees to arrange finacning adequate to meet both of the above obligations. 8. Home agrees to deliver to the tendering stockholders at the closing common capital shares of Home, based on its capitalization on the date of this agreement, equal to one and one-half shares of Home stock for each one share of Rawleigh stock, subject, however, to the adjustments hereinafter provided * * * * * * 10. The exchange ratio of one and one-half shares of Home stock for one share of Rawleigh stock, as hereinabove provided, is predicated upon an adjusted book value of $12.36 per share for the number of shares of capital stock of Rawleigh issued and outstanding 28 at the time of the closing, including the subscription price of all option shares exercised on or prior to that date. The exchange ratio shall not be revised upward in any event. The exchange ratio shall be adjusted downward so that the number of shares of Home stock exchanged for Rawleigh shares shall be reduced from the base exchange ratio in the same proportion that the adjusted book value as hereinafter determined as of March 31, 1962, of Rawleigh and its subsidiaries on a *281 consolidated basis is less than $12.36 per share. Such adjustment, if any, shall be determined as follows: The independent certified public accountants employed by Rawleigh, as determined by Standard, to make the annual audit for the period ending March 31, 1962, shall consult with the independent certified public accountants employed by Home relative to the adjustments, if any, to be made in the book value as determined by said Rawleigh accountants in their annual audit. Said accountants shall consult and attempt to agree upon the notes and accounts receivable which are worthless as of March 31, 1962, and accounts thus determined to be worthless shall be charged to the reserves for losses provided as at that date to the extent that said reserves are adequate, and the excess, if any, shall be charged against operating income. Said accountants shall then determine by agreement the amount of normal reserves for losses to be established with respect to the remaining notes and accounts receivable on Rawleigh's books in accordance with generally accepted accounting principles and practices, and having regard for practices in similar finance businesses. The existing reserves for losses *282 shall be increased by the amount of the excess of said agreed total reserves figure over the total recorded reserves, and the said increase shall be charged to operating income. The remaining assets and liabilities 29 of Rawleigh reflecting reserves other than reserves for losses shall be determined by agreement between the accountants in accordance with generally accepted accounting practices and principles. The assets less liabilities and reserves after effecting the above adjustments shall be the "adjusted book value" referred to above which shall be the basis for determining the exchange ratio, as above provided. The decision of the accountants made in good faith as agreed shall be binding on both parties. In determining said book value, treasury stock shall not be considered as issued and outstanding. 11. The accountants shall attempt to reach an agreement by June 1, 1962. If either accountant determines at any time that said accountants will not be able to reach an agreement, either party may, upon ten days' written notice to the other party, request S. D. Leidesdorf & Co., certified public accountants, to make an independent determination of adjusted book value, applying *283 the principles hereinabove set forth, and their decision shall be made as soon as practicable, and shall be binding and conclusive on the parties in the absence of bad faith. Rawleigh shall incur the expense of its accountants, and Home shall incur the expense of its accountants. The parties shall share equally the expense of S. D. Leidesdorf & Co. if that becomes necessary. The accounts charged off as worthless, as above provided, shall be segregated and shall at the closing become the property of the selling shareholders of Rawleigh. Said accounts shall forthwith be assigned to Wachovia Bank and Trust Company, as Trustee for such shareholders.Home agrees to act as Agent For Collection only, and not as principal, and to devote reasonable efforts to the collection of said accounts, having regard for the 30 expense of collections, and to transfer from time to time such net recoveries, after deducting Home's reasonable expenses, but not to exceed Commercial Law League standard collection rates, to said trustee; and thereupon Home shall be discharged of all further responsibility and shall not be answerable for the application of such funds by the Trustee. 12. The closing date shall *284 be such as is mutually agreed between Home and Standard, but not later than thirty days after the determination of said adjusted book value by the accountants. Provided, however, that said date shall be further extended, if necessary, to comply with Security and Exchange Commission, and/or American Stock Exchange regulations, and any other laws and regulations applicable to the issuance and transfer of said stock. * * * 14. The parties agree to take all necessary steps and execute all necessary documents to carry out the intent of this Agreement. It is the intent of this Agreement that a breach by either party of the representations contained herein, or any other event, shall not be cause for terminating said Agreement, but shall be a basis only for an adjustment downward, (but not upward) in the purchase price. In the event of a dispute not specifically provided for herein, either party shall have the right upon written notice to the other party to refer said dispute to the American Arbitration Association to be decided in accordance with their then rules and regulations applicable. The decision of said Association made in good faith shall be binding and conclusive on all parties *285 hereto without recourse to the courts. The losing party in such arbitration proceedings shall bear the cost of such proceedings unless the Association determines that a different apportionment of such expenses is equitable. * * * 31 While the September 8, 1961 agreement provided for an acquisition of all of the business and assets of Rawleigh by "merger," it was to be left to counsel for the parties to determine the mechanics of the acquisition, that is, whether there would be a statutory merger or a so-called "practical merger," through an acquisition of all of the assets of Rawleigh-Parent solely in exchange for voting stock of Home and the assumption of Rawleigh-Parent's liabilities. Standard's attorney suggested that the "practical merger" route be followed, and this was, in fact, the method which was eventually used. The provision concerning management in paragraph 5 of the agreement came about as follows: Standard's principal reason for disposing of its Rawleigh shares (in addition to the fact that Standard felt it was not suited for the finance business) was its lack of adequate management, either at High Point or from other sources. Standard insisted that Home supply competent *286 management at the expense of Rawleigh with adequate safeguards to both sides. Standard was aware of Home's employment of Griffith, and Standard's officials understood that he would be taking over the management of the Rawleigh companies. 32 The provision in paragraph 6 of the agreement of September 8, 1961, to the effect that Home would have the right, but not the obligation, to discontinue and commence liquidation of all or any part of the consumer credit business operated by Rawleigh or its subsidiaries referred to the charge card business of Piedmont Customer Service, Inc. It was considered that this was "an appendage" to the principal factoring business of Rawleigh. It had been recently commenced, had grown very rapidly, and the parties felt that it could not be fully evaluated at that particular point. Concerning Standard's obligation to deliver, at the closing, not less than 67 percent of the shares of Rawleigh, the Standard representatives were sure that such a percentage of Rawleigh shares could be delivered because of the shares actually owned by Standard, shares with respect to which Standard had an option, shares in which Standard had voting rights, and shares Standard *287 knew would be voted in favor of the exchange. The provision in paragraph 14 of the September 8, 1961 agreement to the effect that it was the intent of the parties that a breach by either party of the representations contained in the agreement, or "any other event," shall not be cause for terminating said 33 agreement, but shall be a basis only for an adjustment of the exchange ratio downward, but not upward, was thought by the Standard representatives to be to Standard's advantage. Standard wanted to make certain that Home would not take over effective management for a period, turn the business back to Standard, and leave Standard stranded without management, since J. N. Rawleigh was being forced out. On September 11, 1961, the board of directors of Rawleigh-Parent held a meeting at High Point. Hogan reported the background leading up to the agreement between Standard and Home. One of Standard's attorneys summarized the agreement in detail and answered questions concerning various provisions in the agreement. He explained the possibility of a downward adjustment in the price by a decrease in the book value per share below "$12.37" [sic]. He explained this adjustment as follows: *288 This could occur by the method in computing reserves, write offs of PCS delinquent accounts that are adjudged worthless or losses suffered in the factoring accounts. * * * Also at this meeting, James Rawleigh stated that, in his opinion, any such reductions would not be sufficient to reduce the book value below $12.37 [sic] per share on March 31, 1962. The board adopted the following resolution: 34 RESOLVED, that the proposed acquisition of the business and assets, subject to the liabilities of the J. N. Rawleigh Company by Home Finance Group, Inc., through a statutory merger or such other method of acquisition as the officers hereinafter specified shall determine to be advisable upon the basis of an exchange of common stock of the Home Finance Group, Inc. for the stock of this Company, of one and one-half common shares of Home Finance Group, Inc. for each common share of stock of this Company, subject to the adjustments and other terms and provisions set forth in the "Purchase and Sales Agreement" dated September 8, 1961, between Home Finance Group, Inc., J. N. Rawleigh Company, and Standard International Corporation, be and hereby is authorized, approved, ratified and confirmed; *289 and that a majority of the Directors and the President, Executive Vice President, Secretary or an Assistant Secretary, are hereby authorized to enter into an appropriate merger agreement with Home Finance Group, Inc., and the Purchase and Sale Agreement, copy of which is made a part of these minutes, to execute such agreements and other documents, and take such steps as are determined by him or them to be advisable to effect this transaction and any one or more of the officers hereinafter designated are hereby authorized and directed to submit the approval of this Board of said transaction and said merger agreement to the stockholders of this Company for necessary action in accordance with the laws of Delaware and other applicable provisions of law, to be acted upon at a special stockholders' meeting which shall be called by any one or more of said officers in accordance with the laws, and the by-laws of this Company, and the President, Executive Vice President, Secretary, Assistant Secretary, and Treasurer, and any of them, be and he and they are hereby authorized to execute said Purchase and Sale Agreement and all documents and take any other action which they, or any of them, determine *290 to be advisable to effect this transaction; his or their execution or action to be sufficient evidence of his or their determination. 35 At the September 11, 1961 board meeting J. N. Rawleigh submitted his resignation as a director, president, treasurer and member of the finance committee of Rawleigh-Parent. Robert W. Griffith was elected president. Daniel E. Hogan, president of Standard, was elected executive vice president. Griffith, J. E. Burnside, Jr. and Home's local attorney, B. Irvin Boyle, were elected to take the place of three members of the 11-member board of directors. The board also approved an employment agreement with J. N. Rawleigh wherein he agreed to provide such consulting services and other services as the president or executive vice president shoud designate, at the salary which he had been receiving as president, until March 31, 1962. (In actual fact, however, Griffith had no intention of availing himself of J. N. Rawleigh's services.) There was nothing in the agreement which prohibited James Rawleigh from re-entering the factoring business. On September 12, 1961, Home's board of directors held a meeting. The terms of the September 8, 1961 agreement were *291 reviewed. The board unanimously approved the agreement and the Home officers were "authorized and instructed to issue the said agreement which bears the date of September 8, 1961." As of September 5, 1961 the 36 members of the board of directors of Home and the immediate members of their families owned approximately 53 percent of the shares of Home. [5] On the afternoon of September 12, 1961, after Home's board approved the September 8, 1961 agreement, Burnside, Home's president, Williams, vice president and secretary of Home, Griffith, and others from Home, went to the J. N. Rawleigh Company offices at High Point, North Carolina. Hogan was still in High Point following the meeting of the Rawleigh board on the preceding date. Burnside, Home's president, advised the Rawleigh personnel that Home was in the process of acquiring Rawleigh-Parent, and that Home was taking over the company. That evening the Home representatives met at dinner with the executives of the *292 Rawleigh companies. Again Home's president told the group about the merger of the two companies. Home's personnel director explained the benefits (such as hospitalization insurance) which would be available to the Home employees after the merger was effected in 1962. 37 On September 15, 1961, the common stock of Home was listed for trading on the American Stock Exchange. Immediately after the September 12, 1961 announcement, Home effected a complete change of management in the operation of Rawleigh-Parent and its subsidiaries and, as the management company, Home began segmenting various phases of the operation of Rawleigh-Parent and its subsidiaries. Robert W. Griffith, A Home employee, was installed by Home as president of Rawleigh-Parent and its subsidiaries. Griffith moved to High Point, North Carolina, and was constantly on the scene at the Rawleigh offices. Griffith was in charge of the day-to-day operation of Rawleigh-Parent and its subsidiaries. Home had effective control and management of Rawleigh-Parent and its subsidiaries. Although Griffith received the majority of his salary from Rawleigh-Parent and was legally responsible to its board of directors, he was under the *293 de facto control and direction of, and directly responsible to J. E. Burnside, Jr., Home's president, and Williams, Home's vice president and secretary. Griffith received a nominal salary and fringe benefits, such as life and health insurance, from Home. In making decisions concerning the operation of Rawleigh-Parent and its subsidiaries, Griffith constantly consulted Williams or the other Home 38 representatives. Griffith made out daily reports on the operation of Rawleigh-Parent and its subsidiaries. The reports were usually in diary form. Each evening Griffith would record the reports on a dictating machine and on Friday night Griffith would mail the reports to his "boss," J. E. Burnside, Jr., president of Home. Burnside's secretary would transcribe the notes on Saturday and, customarily, the first thing Monday morning a conference was held in Charlotte, with J. E. Burnside, Jr., and other officers of Home, wherein the previous week's operation of Rawleigh-Parent and its subsidiaries was discussed by Griffith and the others. Williams was repeatedly at the Rawleigh offices in High Point, usually spending two to three days a week there. Craver, who had been hired by Griffith *294 in July of 1961 to be the credit manager of Home Factors Corporation, was made credit manager of Rawleigh-Parent and its subsidiaries and was at the Rawleigh offices constantly. Robert S. Kuebler, senior vice president in charge of Home's consumer loan division, was sent to High Point to investigate the operations of Piedmont Customer Service, Inc. Kuebler brought several Home employees with him to High Point for this purpose. 39 Blackweld, who was in charge of Home's data processing division in Charlotte, was sent to the Rawleigh offices in High Point to supervise the IBM division. Following the approval of the September 8, 1961 agreement by the directors of the two corporations, Home's representatives began an intensive study of the accounts receivable of the Rawleigh-Parent subsidiary companies. Early in October after about two weeks of study, it became apparent to Williams that an audit should be made and he asked Rawleigh-Parent's directors to have this done for the six-month period ending September 30, 1961. Williams, who was repeatedly at the Rawleigh offices in High Point, analyzed the accounts receivable in addition to other phases of the Rawleigh operation. After studying *295 and evaluating the accounts receivable, Williams discussed them with Griffith and reported his findings to J. E. Burnside, Jr., Home's president. In addition to analyzing the accounts receivable, Williams studied and reviewed all the accounting records of Rawleigh-Parent and its subsidiaries. Williams also reviewed the client statements with the credit managers and copies of the statements were given to Griffith or Williams monthly. A client statement is the record of 40 the daily transactions with that particular client. It is a record of the invoices purchased during the month by Rawleigh, the payments made to the client resulting in a net reserve due the client or, if it is an advance, the balance due Rawleigh. It is what the client owes Rawleigh or what Rawleigh owes the client. Doubtful and problem accounts were discussed with Williams and Griffith, and sometimes with Craver. The credit managers of Rawleigh were never consulted as to the accounts receivable which were written off by Home and had no say-so or privity to the management decisions of the Home representatives. The consumer factoring business, Piedmont Customer Service, was extensively analyzed by Home's personnel *296 who, under the terms of paragraph 6 of the September 8, 1961 agreement, had the right to determine whether this type of business should be continued, sold, or liquidated. After an investigation, the decision was made in October, 1961, to discontinue the further purchasing of consumer-factoring accounts and the necessary notifications to that effect were sent out terminating the agreements under the Rawleigh factoring contracts. One reason why Home wanted to phase out this aspect of the business was Home's estimation that it did not have the capability to handle efficiently the large quantity of accounts connected therewith. 41 Under the direction of Home's representatives, the consumer factoring subsidiary then started an intensive collection program. For the convenience of the customers of the consumer factoring subsidiary, arrangements were made for them to pay their balances at one of Home's subsidiary offices in their locality. Standard began to hear reports that a group of the Home people, who were led by Williams, were criticizing the adequacy of the bad debt reserves of the Rawleigh group. Home's representatives had segmented various phases of the operations of the Rawleigh *297 companies and were scrutinizing the receivables. Standard sent a few representatives, including an accountant, to High Point, to protect its interest by examining receivables and observing what Williams and the Home group had done. The Standard representatives were trying to make sure that the Home people were not taking and making excessive claims as to write offs of accounts receivable and setting up excessive reserves. Standard also employed Jerome Facher, a litigation attorney, who spent three or four weeks in High Point observing this situation for the purpose of preparing for possible litigation with the Home group. 42 The consolidated "Allowance for Losses" (reserve for bad debts) on the books of Rawleigh-Parent and its subsidiaries as of August 31, 1961, was $184,824. Williams and Griffith determined that the consolidated "Allowance for Losses" should be increased to $1,425,000 and, in accordance with Griffith's instructions, the allowance was increased to that amount on the monthly balance sheet dated September 30, 1961, as follows: Notes and Accounts Receivable
Allowance for Losses Rawleigh of North Carolina
$5,108,533
$360,000
Rawleigh of Florida
993,706
150,000
Rawleigh of Kentucky
1,556,792
40,000
Piedmont Customer Service
3,571,243
750,000
Piedmont Assets
973,940
125,000
Total
$12,204,214
$1,425,000
By *298 increasing the "Allowance for Losses," and thereby de By increasing the "Allowance for Losses," and thereby decreasing the consolidated book value of the Rawleigh companies, Home was placed in a better bargaining position with regard to its acquisition of Rawleigh-Parent under the terms of paragraph 10 of the September 8, 1961 agreement. The audit of the September 30, 1961 balance sheet of the Rawleigh companies and the related statement of income and retained earnings for the six-month period ending September 30, 1961, which Williams had requested, was undertaken by Lindsay, Squires & Everett, Certified Public Accountants. Their "Report on Examination," dated 43 November 29, 1961, stated that their examination was made in accordance with generally accepted auditing standards except that the terms of their engagement did not include an examination of the receivables of P.C.S., Inc. (formerly Piedmont Customer Service, Inc.) which aggregated approximately 25 percent of the consolidated assets. Although no statement was made with respect to the P.C.S., Inc. receivables, the audit report stated that the additional provisions for losses for the other Rawleigh subsidiaries reflected on *299 the September 30, 1961 balance sheet were "deemed necessary for the current year." With regard to the P.C.S., Inc. receivables, the report made the following statement in the section entitled "Supplementary Financial Statements, Without Audit": Representatives of Home Finance Group, Inc. aged the accounts at cycle closing dates in October, 1961. This ageing was summarized as follows: Current accounts
$1,321,989.66
Token payment accounts
674,518.90
90-day accounts
330,599.93
Chattels and charge backs - 90-day
36,426.60
Accounts not paying
471,199.33
Total
$2,834,734.42
It was Rawleigh's policy to prepare monthly consolidated balance sheets, comparative profit and loss statements, aging schedules of accounts receivable and 44 client statements, which reflected the financial operation of Rawleigh-Parent and its subsidiaries for that month. The aforementioned records were prepared for the months of September, October, November and December, 1961, and copies were given to Griffith and also made available to Williams. Williams received copies of the monthly balance sheets and comparative profit and loss statements about two weeks after the end of each month. Williams studied all of the above records *300 when they were made available to him. The audit report for the six-month period ended September 30, 1961, showed that on a consolidated basis, Rawleigh-Parent and its subsidiaries (excluding Piedmont Building Corporation) had a net worth of $422,887. This represented a salient decrease from the consolidated net woth recorded as of August 31, 1961, in the amount of $2,302,233, and was in large part attributable to the aforementioned increase in allowances for losses. The monthly consolidated balance sheets for the Rawleigh companies (excluding Piedmont Building Corporation) dated October 31, November 30, and December 31, 1961, showed consolidated net worths of $458,085, $397,803, and $370,869, respectively. 45 The financial condition of J. N. Rawleigh Company of North Carolina as reflected on the monthly consolidated balance sheets was as follows: Monthly Statement Date J. N. Rawleigh Company of North Carolina
September 30, 1961
October 31, 1961
November 30, 1961
December 31, 1961
Total Assets (Less Reserves for Discounts, Losses, Depreciation)
$5,640,771.00
$5,301,823.00
$5,198,902.00
$5,074,584.00
Less: Liabilities
5,917,976.00
5,568,028.00
5,463,905.00
5,350,851.00
Net Surplus or (Deficit):
($277,205.00)
($266,205.00)
($265,003.00)
($276,267.00)
Analysis of Surplus or Deficit:
Capital Stock
$10,000.00
$10,000.00
$10,000.00
$10,000.00
Retained Earnings as of 3/31/61
74,001.00
74,001.00
74,001.00
74,001.00
Retained Earnings (Loss) Period Ending 9/30/61
($361,206.00)
10/31/61
($350,206.00)
11/30/61
($349,004.00)
12/31/61
($360,268.00)
Total Stockholders' Equity - Net Worth:
($277,205.00)
($266,205.00)
($265,003.00)
($276,267.00)
*301 46 On the last day of September, October, November, and December of 1961, J. N. Rawleigh of North Carolina owed Rawleigh-Parent $5,490,497, $5,119,459, $5,212,235, and $5,074,082, respectively. The financial condition of J. N. Rawleigh Company of Florida, as reflected on the monthly consolidated balance sheets was as follows: Monthly Statement Date
J. N. Rawleigh Company of Florida
September 30, 1961
October 31, 1961
November 30, 1961
December 31, 1961
Total Assets (Less Reserves for Discounts, Losses, Depreciation)
$931,425.00
$910,543.00
$837,413.00
$959,944.00
Less: Liabilities
992,044.00
965,937.00
888,314.00
1,007,369.00
Net Surplus or (Deficit)
($60,619.00)
($55,394.00)
($50,901.00)
($47,425.00)
Analysis of Surplus or Deficit:
Capital Stock
$5,000.00
$5,000.00
$5,000.00
$5,000.00
Retained Earnings as of 3/31/61
45,995.00
45,995.00
45,995.00
45,995.00
Retained Earnings (Loss) Period
Ending 9/30/61
(111,614.00)
10/31/61
(106,389.00)
11/30/61
(101,896.00)
12/31/61
(98,420.00)
Total Stockholders' Equity - Net Worth:
($60,619.00)
($55,394.00)
($50,901.00)
($47,425.00) 47 On the last day of September, October, November, and December of 1961, J. N. Rawleigh of Florida owed Rawleigh-Parent $899,564, $917,703, $866,734, and $938,276, *302 respectively. The financial condition of J. N. Rawleigh Company of Kentucky, as reflected on the monthly consolidated balance sheets was as follows: Monthly Statement Date
J. N. Rawleigh Company of Kentucky
September 30, 1961
October 31, 1961
November 30, 1961
December 31, 1961
Total Assets (Less Reserves for Discounts, Losses, Depreciation)
$1,605,719.00
$1,555,747.00
$1,579,235.00
$1,656,455.00
Less: Liabilities
1,562,001.00
1,506,394.00
1,523,712.00
1,602,084.00
Net Surplus or (Deficit)
$43,718.00
$49,353.00$0
$55,523.00
$54,371.00
Analysis of Surplus or Deficit:
Capital Stock
$10,000.00
$10,000.00
$10,00.00
$10,000.00
Retained Earnings as of 3/31/61
30,765.00
30,765.00
30,765.00
30,765.00
Retained Earnings (Loss) Period Ending 9/30/61
2,953.00
10/31/61
8,588.00
11/30/61
14,758.00
12/31/61
13,606.00
Total Stockholders' Equity - Net Worth:
$43,718.00
$49,353.00
$55,523.00
$54,371.00
On the last day of September, October, November, and December of 1961, J. N. Rawleigh of Kentucky owed Rawleigh-Parent $1,398,873, $1,312,148, $1,321,605, and $1,417,801, respectively. 48 The financial condition of Piedmont Customer Service, Inc., as reflected on the monthly consolidated balance sheets was as follows: Monthly Statement Date
Piedmont Customer Service, Inc.
September 30, 1961
October 31, 1961
November 30, 1961
December 31, 1961
Total Assets (Less Reserves for Discounts, Losses, Depreciation)
$2,933,656.00
$2,974,484.00
$2,740,630.00
$2,529,878.00
Less: Liabilities
3,494,738.00
3,532,660.00
3,380,546.00
3,191,052.00
Net Surplus or (Deficit)
($561,082.00)
($558,176.00)
($639,916.00)
($661,174.00)
Analysis of Surplus or Deficit:
Capital Stock
$55,000.00
$55,000.00
$55,000.00
$55,000.00
Paid-In Capital in Excess of Par Value
50,000.00
50,000.00
50,000.00
50,000.00
Retained Earnings as of 3/31/61
15,239.00
15,239.00
15,239.00
15,239.00
Retained Earnings (Losses) for Period Ending 9/30/61
(681,321.00)
10/31/61
(678,415.00)
11/30/61
(760,155.00)
12/31/61
(781,413.00)
Total Stockholders' Equity - Net Worth:
($561,082.00)
($558,176.00)
($639,916.00)
($661,174.00)
*303 49 On the last day of September, October, November, and December of 1961, Piedmont Customer Service, Inc. owed Rawleigh-Parent $3,473,988, $3,528,673, $3,380,546, and $3,191,014, respectively. The financial condition of Piedmont Assets, Inc., as reflected on the monthly consolidated balance sheets, was as follows: Monthly Statement Date
Piedmont Assets, Inc.
September 30, 1961
October 31, 1961
November 30, 1961
December 31, 1961
Total Assets (Less Reserves for Discounts, Losses, Depreciation)
$851,222.00
$756,430.00
$786,896.00
$767,496.00
Less: Liabilities
921,064.00
821,494.00
848,197.00
823,937.00
Net Surplus or (Deficit)
($69,842,00)
($65,064.00)
($61,301.00)
($56,441.00)
Analysis of Surplus or Deficit:
Capital Stock
$1,000.00
$1,000.00
$1,000.00
$1,000.00
Retained Earnings as of 3/31/61
21,281.00
21,281.00
21,281.00
21,281.00
Retained Earnings (Loss) for Period Ending 9/30/61
(92,123.00)
10/31/61
(87,345.00)
11/30/61
(83,582.00)
12/31/61
(78,722.00)
Total Stockholders' Equity - Net Worth:
($69,842.00)
($65,064.00)
($61,301.00)
($56,441.00) 50 On the last day of September, October, November, and December of 1961, Piedmont Assets, Inc. owed Rawleigh-Parent $737,611, $733,416, $702,346, and $690,190, respectively. The *304 financial condition of all the subsidiaries, as reflected on the monthly consolidated balance sheets, was as follows: Monthly Statement Date All Subsidiaries
September 30, 1961
October 31, 1961
November 30, 1961
December 31, 1961
Total Assets (Less Reserves for Discounts, Losses, Depreciation)
$11,962,793.00
$11,499,027.00
$11,143,076.00
$10,988,357.00
Less: Total Liabilities
12,887,823.00
12,394,513.00
12,104,674.00
11,975,293.00
Total Net Surplus or (Deficit)
($925,030.00)
($895,486.00)
($961,598.00)
($986,936.00)
Analysis of Total Surplus or Deficit:
Total Capital Stock
$81,000.00
$81,000.00
$81,000.00
$81,000.00
Total Paid-In Capital in Excess of Par Value
50,000.00
50,000.00
50,000.00
50,000.00
Total Retained Earnings as of 3/31/61
1,187,281.00
187,281.00
187,281.00
187,281.00
Total Retained Earnings (Loss) for Period Ending 9/30/61
(1,243,311.00)
10/31/61
(1,213,767.00)
11/30/61
(1,279,879.00)
12/31/61
(1,305,217.00)
Total Stockholders' Equity - Net Worth:
($925,030.00)
($895,486.00)
($961,598.00)
($986,936.00) 51 Shortly prior to December 14, 1961, Home and Standard agreed to have a meeting for the purpose of attempting to make a final settlement and arrive at an agreed "purchase price" - the so-called "exchange ratio" of *305 Home's stock for Rawleigh-Parent's stock. This would eliminate the possibility of arbitration or litigation. A meeting was arranged in Charlotte between the Standard and Home representatives on December 14, 1961. At the meeting Standard was represented by John Bolton, Sr., chairman of the board of Directors, Hogan, president, John Bolton, Jr., vice president, and two attorneys. Home was represented by J. E. Burnside, Jr., president, Williams, vice president and secretary, and Griffith, chief executive officer of Home's factoring operations and president of Rawleigh-Parent. At the time of the December 14, 1961 meeting, the Home representatives had received the consolidated balance sheets, comparative profit and loss statements, the aging schedule of accounts receivable, and the client statements, of Rawleigh-Parent and its subsidiaries for the months of September and October of 1961, as well as the audit report prepared by Lindsay, Squires & Everett, Certified Public Accountants, for the six-month period ending September 30, 1961. 52 The December 14, 1961 meeting was "very argumentative," "stormy," and the participants almost reached the point of "calling each other names." The *306 meeting lasted for almost a full day. The Standard representatives felt that Home had been unrealistically conservative in its estimation of the reserves for bad debts necessary with respect to the receivables of the Rawleigh subsidiaries. Standard's litigation attorney was present at the meeting in the event litigation should follow.Hogan also criticized Home's manner of managing the Rawleigh operations for the reason that prior to the time Home assumed management, the Rawleigh companies had been making a profit. On December 14, 1961, Home's shares were selling for about $15 per share on the American Stock Exchange. At the aforementioned meeting the Standard representatives proposed that the merger ratio should be on a one-for-one basis.This proposal was rejected by Home's representatives. Home made an offer for .5 shares of Home stock to one share of Rawleigh-Parent's stock. Finally, the parties agreed as to an exchange ratio of .6 shares of Home's stock for one share of Rawleigh-Parent's stock. Pursuant to the agreement reached on December 14, 1961, the Standard group returned to Massachusetts where an amendment to the September 8, 1961 agreement was 53 prepared and later executed *307 on January 8, 1962. Although the original agreement tentatively called for a statutory merger in accordance with the laws of Delaware and North Carolina, it was mutually agreed to by the parties that the merger would be accomplished by the acquisition of Rawleigh-Parent's assets for the stock of Home, resulting in a so-called practical merger. The amendment to the purchase and sale agreement provides in part as follows: (1) Home agrees to deliver at the closing to the tendering stockholders of Rawleigh or to Rawleigh (in exchange for assets and assumption of liabilities) common capital shares of Home based on its capitalization as of September 8, 1961, in such an amount so that each share of Rawleigh stock shall be equal to six-tenths (6/10ths) of a share of Home stock. (2) The closing shall take place on March 31, 1962; * * * * * * (4) The premium expenses, if any, of eliminating the 9% subordinated notes provided in Paragraph 7 of the agreement of September 8, 1961, shall be borne by Rawleigh. (5) Standard agrees not to exercise the options referred to in Paragraphs 3 and 7 of the agreement of September 8, 1961. (6) The following provisions of the agreement of September 8, 1961, *308 are hereby deleted: 1. All of Paragraphs 10, 11 and 12. 2. That portion of the second sentence of Paragraph 3a reading "and at the closing will have exercised said option in full." 54 3. The second and third complete sentences of Paragraph 7 beginning with the words "Standard agrees" and ending with the words "closing date." 4. The first complete sentence of Paragraph 8 beginning with the words "Home agrees" and ending with "hereinafter provided." 5.That portion of the second sentence of Paragraph 14 which begins "but shall" and ends "the purchase price" and such second sentence shall end with the word "Agreement." (7) The following shall be added to Paragraph 4 of the agreement of September 8, 1961: "The parties agree that a formal statutory merger is not essential to carry out the terms of this Agreement and further agree that this agreement shall be carried out by a practical merger, meaning a transfer of all of Rawleigh's assets to Home upon Home's assumption of all of Rawleigh's liabilities in exchange for Home stock, followed thereafter by liquidation of Rawleigh, in which the Home stock would be distributed at a ratio of six-tenths (6/10) of a share of Home stock for each *309 share of Rawleigh. In effecting the practical merger, the Agreement of September 8, 1961, is to be interpreted consistently therewith and all provisions of said Agreement inconsistent with or not applicable to a practical merger shall be of no force and effect." (8) Except as hereinabove provided, in all other respects, the Agreement of September 8, 1961, is reaffirmed. * * * On January 11, 1962, the stockholders of Rawleigh-Parent held a meeting, for which appropriate notices were mailed on December 8 and 12, 1961, and at the meeting they approved the practical merger on the exchange ratio of .6 shares of Home stock for one share of Rawleigh-Parent stock. On January 31, 1962, the consolidated net worth of Rawleigh-Parent and its subsidiaries was $204,951. 55 During the month of March, 1962, Home advanced a total of $6,935,000 to Rawleigh-Parent. These funds were used by Rawleigh-Parent to pay indebtedness to banks under its lines of credit. Thereupon, Rawleigh-Parent became indebted to Home. On the morning of March 31, 1962, Rawleigh-Parent had a total of $8,257,973.01 in assets recorded on its books, consisting of $21,385.78 in cash, a $72,453.86 claim for refund of Federal *310 tax, and the following equity and debt investments (recorded at face amount) in its subsidiaries: Stock
Notes and accounts receivable Rawleigh-N.C.
$10,000.00
$4,076,826.55
Rawleigh-Ky. (S.C. )
10,000.00
1,309,863.42 a1
Rawleigh-Fla.
5,000.00
985,938.25
P.C.S., Inc.
76,152.22
958,105.64
Piedmont Assets
1,000.00
555,462.75
Piedmont Building
1,000.00
174,784.54 a2 *311 $103,152.22
$8,060,981.15 56 Rawleigh-Parent had total liabilities of $6,985,658.46, and total capital of $1,272,314.55 recorded on its books, as follows: Notes and accounts payable to Home
$6,935,000.00
Accrued interest due Home
26,189.64
Accrued payroll due Home
1,257.81
Accounts payable - regular
12,354.91
Accrued taxes
10,856.10
Total liabilities
$6,985,658.46
Common stock
135,673.00
Paid in surplus
1,209,948.01
Earned surplus
(73,306.46)
Total capital
$1,272,314.55
Total liabilities and net worth
$8,257,973.01
At the same time, the consolidated balance sheet for Rawleigh-Parent and its subsidiaries (in which all intercompany payables and receivables were eliminated) indicated total assets of $8,026,824.32, total liabilities of $8,177,663.22, and a deficit in total capital (net worth) in the amount of $150,838.90. On March 31, 1962, and immediately before assets of Rawleigh-Parent were recorded on Home's books to carry out the merger agreement, a journal entry on Rawleigh-Parent's books reflected the closing *312 of certain portions of the receivables due from the Rawleigh subsidiaries 57 against the $6,935,000 payable to Home. Appropriate entries were also made on the books of the subsidiaries to reflect the substitution of Home, in the place of Rawleigh-Parent, as the creditor with regard to the above-mentioned receivables. The face amount of the receivables transferred to Home, in this transaction, and the balance of receivables remaining on the Rawleigh-Parent books were as follows: Debtor
Receivables Transferred
Balance Rawleigh-N.C.
$4,027,000.00
$49,826.55
Rawleigh-Fla.
971,400.00
14,538.25
Rawleigh-Ky. (S.C.)
1,290,100.00
19,763.42
Piedmont Customer Service
271,800.00
686,305.64
Piedmont Assets
200,000.00
355,462.75
Piedmont Building
174,700.00
84.54
$6,935,000.00
$1,125,981.15
The formality of closing took place on March 31, 1962, in accordance with the January 8, 1962 amendment to the September 8, 1961 agreement. At the closing Home acquired all of Rawleigh-Parent's remaining assets and assumed all of its remaining liabilities in exchange for 81,403 shares of Home's newly issued voting stock. [6] *313 The assets 58 transferred and liabilities assumed were as follows: Assets Cash
$21,385.78
Balance of notes and accounts receivable due from subsidiaries
1,125,981.15
Stock in subsidiaries
103,152.22
Claim for Federal tax refund
72,453.86
$1,322,973.01 Liabilities Accrued interest due Home
$26,189.64
Accrued payroll due Home
1,257.81
Accounts payable - regular
12,354.91
Accrued taxes
10,856.10
$50,658.46
The journal entry reflecting this transfer stated that it was "[to] record purchase of the assets of J. N. Rawleigh Company, Del. [Rawleigh-Parent] for the exchange of 81,403 shares of Home's common stock." It has been stipulated that this journal entry was made after "giving effect" to the aforementioned journal entry on Rawleigh-Parent's books which reflected the closing of certain receivables due from the Rawleigh subsidiaries against the $6,935,000 payable to Home. At the time of the reorganization *314 on March 31, 1962, the subisidiaries of Rawleigh-Parent had the following assets, liabilities, and net worth (parentheses indicate a deficit): 59 Assets
Liabilities
Net Worth Rawleigh-N.C.
$4,138,741.38
$ 4,699,104.40
[560,363.02)
Rawleigh-Fla.
1,108,714.57
1,175,781.43
(67,066.86)
Rawleigh-S.C.
1,401,388.63
1,499,787.70
(98,399.07)
Rawleigh-Ky.
5,428.58
-0-
5,428.58
Peidmont Customer Service
446,284.46
962,675.87
(516,391.41)
Piedmont Assets
622,198.81
741,269.85
(119,071.04(
Piedmont Building Corp.
214,795.92
178,934.33
35,861.59
Total
7,937,552.35
9,257,553.58
(1,320,001.23) The following table shows (1) the specific bad debts which were charged to the bad debt reserves of the companies listed below during the taxable year April 1, 1961 to March 31, 1962, (2) the balance in the bad debt reserve account on March 31, 1962, and (3) the receivables remaining as assets of the individual subsidiaries on the latter date: (1)
(2)
(3)
J. N. Rawleigh Company, North Carolina
$658,081.27
$108,400.59
$3,681,820.81
J. N. Rawleigh Company, Florida
185,927.12
17,535.91
1,041,365.83
J. N. Rawleigh Company, South Carolina
173,259.55
23,869.82
1,345,002.52
Piedmont Customer Service, Inc.
99,127.98
None a1 *315 438,878.35
Piedmont Assets, Inc.
28,545.60
119,759.37
602,846.98 60 The following additions to the bad debt reserves of the Rawleigh subsidiaries were made during the taxable year April 1, 1961 to March 31, 1962: J. N. Rawleigh Company, North Carolina
$688,523.76
J. N. Rawleigh Company, Florida
174,500.28
J. N. Rawleigh Company, South Carolina
182,747.68
Piedmont Customer Service, Inc.
46,040.98
Piedmont Assets, Inc.
148,304.97 In addition, the Piedmont Customer Service, Inc. tax recount on receivables sold of $694,537.42. After taking deductions for the foregoing additions to bad debt reserves and the losses on receivables sold during the year, none of the subsidiaries had any taxable income, and they reported losses on their returns for the year ended March 31, 1962, as follows: J. N. Rawleigh Company, North Carolina
$687,566.43
J. N. Rawleigh Company, Florida
138,464.34
J. N. Rawleigh Company, South Carolina
143,864.76
J. N. Rawleigh Company, Kentucky
2,650.00
Piedomont Customer Service, Inc.
628,512.48
Piedmont Assets, Inc.
151,189.38
Rawleigh-Parent reported a loss of $201,170.29 for the same taxable year. 61 As heretofore stated, shortly *316 after September 8, 1961, further purchases by Piedmont Customer Service, Inc. of consumer loans or charge card receivables had been discontinued and an intensive collection program had been started. The best grade of such receivables was "name brand" accounts that had been acquired from the Collins Department Store, The Cato Stores, and two smaller stores. The Collins Department Store's accounts receivables were sold to a newly organized company, in which Home had no interest. Approximately $359,000 in face amount of receivables were sold at a 12 percent discount as of December 30, 1961. The Cato Store's receivables in the face amount of $349,948.50 were sold to a purchaser, in which Home had no interest, for $282,623.91. On February 7, 1962, Home purchased for 16 of its consumer loans subsidiaries substantially all of the accounts receivable of Piedmont Customer Service, Inc., having a face value of $2,315,840.99 for a cash consideration of $1,738,336.97, or an average discount of 25 percent. As previously stated, the Piedmont Customer Service, Inc. tax return for the taxable year ended March 31, 1962, reported a discount on receivables sold during that year in the amount of *317 $694,537.42, which contributed toward a loss of $628,512.48 with no taxable income. 62 Separate records were maintained with respect to the Piedmont Customer Service, Inc. accounts receivable purchased for these 16 Home subsidiaries. Approximately $350,000 was lost over the next three years with respect to the purchase of those receivables. P.C.S., Inc. was liquidated by Home on August 20, 1962, and an income tax return was filed for the short period from April 1 to August 20, 1962, after which the corporation was dissolved. At that time the face amount of its alleged debts to petitioner had been reduced to $830,202.05. After the payment or provision for payment of all obligations other than the indebtedness to Home, the remaining net assets transferred to petitioner in the liquidation amounted to $321,223.91, as follows: Cash
$250.11
Accounts receivable
293,905.08
Accrued interest
2,614.48
Equipment, net
26,511.19
Total
323,280.86
Less Liabilities assumed by Home
2,056.95
Net assets transferred
$321,223.91
On the liquidation, petitioner received the full amount of the remaining assets in partial payment of the debt owed to petitioner in the face amount of $830,202.05. Petitioner was left with *318 notes payable from the liquidated subsidiary in the amount of $508,978.14. 63 Home deducted this amount, less $2,413.27 which it had received as "earnings since acquisition" as a bad debt loss on its tax return for the year ended August 31, 1962. Since Home did not receive any assets from P.C.S., Inc. upon redemption of Home's stock in that subsidiary with an alleged basis of $76,152.22, Home deducted the latter amount in the same taxable year as an ordinary "loss on worthless stock." Piedmont Assets, Inc. was in the consumer factoring business, dealing principally with the leasing of two-way radios and other types of communications equipment, and manufacturing equipment. At some undisclosed time this was found by Home to be an unsatisfactory business. The lessees constantly complained, demanded adjustments, and refused to pay because the equipment would not work. Home was not equipped for repairing radios and had to employ others to do the repairs. Some of the leases were sold to a leasing company which was equipped to service the lessees. The selling price was $200,000, payable from collections made by the purchasing company. It required two and one-half years to collect *319 this obligation. 64 Piedmont Assets, Inc. was liquidated on August 20, 1962, and an income tax return was filed for the short period April 1 to August 20, 1962, after which the corporation was dissolved. Immediately prior to this liquidation, the amount of the debt of Piedmont Assets, Inc. to petitioner had been reduced on petitioner's books to $454,873.86. In the liquidation Home credited Piedmont Assets, Inc. with the unpaid balance of the above-mentioned obligation and the face amount of some other leases less the unearned portion of the lease charges and a reserve for bad debts in the amount of $81,876.27. After payment or provision for payment of all other obligations, the following assets of Piedmont Assets, Inc. were transferred to Home on the liquidation in partial payment of the indebtedness to Home: Cash
$21,979.91
Accounts receivable
$440,035.89
Less:
Reserve for bad debts
81,876.27
Deferred income
42,225.85
Total
$124,102.12
315,933.77
Total
$337,913.68
The debt to Home remained unpaid to the extent of $116,960.18. On its return for the taxable year ended August 31, 1962, Home deducted $114,849.32 ($116,960.18 less $2,110.86 in "earnings since acquisition" on April 1, 1962) as a *320 bad debt loss. Petitioner also 65 deducted $1,000 as an ordinary "loss on worthless stock" since it received no assets upon redemption of this stock on liquidation of this subsidiary. On April 2, 1962, the commercial factoring business was consolidated in J. N. Rawleigh Company of North Carolina, which acquired all of the assets and assumed all of the liabilities of J. N. Rawleigh Company of South Carolina, J. N. Rawleigh Company of Florida, and J. N. Rawleigh Company of Kentucky, in exchange solely for the voting stock of J. N. Rawleigh Company of North Carolina. About May 1, 1962, the Rawleigh operations were moved to Home's headquarters in Charlotte, North Carolina. Within about two weeks, at least two former key employees of Rawleigh, who did not move to Charlotte, were employed by a newly organized factoring concern, Southern General Factors, headed by J. N. Rawleigh as president. This new factoring company took several of the best clients away from the Rawleigh companies. Roger B. Hendrix, a North Carolina attorney, practiced in Winston-Salem, North Carolina, for about nine years prior to September 1, 1962, when he was employed by Home as Home's full-time counsel. He had *321 previously represented various factoring companies, including the Rawleigh companies. 66 Home wanted Hendrix to take care of various legal matters involving J. N. Rawleigh Company of North Carolina. There were many problems in connection with this factoring business, including losses that were being sustained with respect to certain factoring clients, lawsuits and threatened lawsuits against J. N. Rawleigh Company, North Carolina, and controversies with Rawleigh clients that had terminated their businesses or switched to some other factoring company. Hendrix felt that because Home had assumed all of the liabilities of Rawleigh-Parent, there was a possibility that Rawleigh-Parent, which had not been dissolved, might have further undisclosed liabilities for which Home might become liable. Aware that under North Carolina law, the statute of limitations with respect to claims against a corporation expires two years after it is dissolved, Hendrix recommended that Home liquidate and dissolve J. N. Rawleigh Company, North Carolina, in order to protect Home against undisclosed liabilities and put in motion the two-year statute of limitations. On November 1, 1962, J. N. Rawleigh Company, *322 North Carolina, transferred in return for cash or check all of its assets to Home Factors Corporation, which had been organized by Home as a wholly owned subsidiary on July 28, 1961, but which had been dormant since September of 1961. 67 Home Factors assumed all of the known liabilities of J. N. Rawleigh Company, North Carolina, except the liabilities due by it to Home Finance Group, Inc., its parent. The selling price was $4,039,223.77 less "liabilities" assumed, which amounted to $551,351.12, or a net selling price of $3,487,872.65. The contract of sale stated, in part, as follows: 3. Assets Sold. Rawleigh sells hereby to Home the following assets, at the agreed price adjacent to each, unless otherwise indicated, each category of assets represents all of the assets of Rawleigh of that particular category: Notes Receivable Factored Clients
$103,671.70
Notes Receivable Factored Clients Notes Written Off
85,019.41
Accounts Receivable Factored Clients
3,659,982.58
Accounts Receivable Factored Clients, Placed
53,279.66
Accounts Receivable, Others
275.00
Accounts Receivable, Income Tax Refund
1,517.45
Utility Deposits
120.00
Accounts Receivable Factored Clients Accts., Written Off
52,693.48
Airplane Deposits - Travel Cards
675.00
Accounts Receivable - Travel Advance Officers
300.00
Accounts Receivable - Twin States Insurance Co.
3,610.00
Leasehold Improvements
68,197.61
Furniture and Equipment
68,197.61
Airplane
4,420.09
Prepaid Insurance
1,087.46
Prepaid Rents
2,116.00
Prepaid Airplane Expense
504.79
Total
$4,039,223.77 a1
*323 * * * 68 5. Liabilities Assumed. Home assumes and agrees to be responsible for only those liabilities of Rawleigh itemized below, at the agreed price adjacent to each, a2 *324 and unless otherwise indicated, each category of liabilities represents all of the liabilities of Rawleigh of that particular category: Accounts Payable - Employees State Withholding Tax
$324.06
Accounts Payable - Trade
913.62
Accounts Payable - Trade, Others
787.18
Accounts Payable - Factored Clients Holdbacks
321,798.69
Accrued Taxes, General
775.71
Accrued Taxes, Federal Unemployment
529.73
Accrued Taxes, State Unemployment
110.94
Reserve for Discount
28,174.75
Allowance for Losses[current]
26,740.80
Allowance for Losses, Factored Accounts Written Off[accounts placed for collections]
137,847.44
Reserve for Depreciation - Furniture and Fixtures
31,518.40
Reserve for Amortization of Leasehold Improvements
61.99
Reserve for Depreciation - Airplane
1,767.81
Total Liabilities
$551,351.12 69 On December 23, 1962, J. N. Rawleigh Company, North Carolina, was liquidated by Home Finance Group, Inc., its parent. As a result of this transaction, J. N. Rawleigh Company, North Carolina, was left without any assets, leaving payables due Home, its parent, in the amount of $830,104.81. By December 23, 1962, all but one of the Rawleigh subsidiaries had been dissolved by Home, the one remaining subsidiary being Piedmont Building Corporation which is still in existence and operates under the real estate division of American Credit Corporation. On its income tax returns for the taxable years ended August 31, 1962, and August 31, 1963, Home claimed the following amounts as deductions for bad debts attributable to the write off of receivables due from the former Rawleigh subsidiaries (Piedmont Customer Service, Inc., and Piedmont Assets, Inc. in 1962, and J. N. Rawleigh Company of North Carolina in 1963) to Home, and losses on worthless stock of these wholly owned subsidiaries: Year Ended
Bad Debts
Loss on Worthless Stock
8/31/62
$621,324.19
$77,152.22
8/31/63
830,104.81
20,000.00
For the taxable year ended August 31, 1962, Home reported a net operating loss of $25,685.71, computed as follows: *325 70 Taxable Income (before net operating loss deduction)
$1,121,006.79
Less: Dividends Received Deduction
1,146,692.50
Net Operating Loss
$25,685.71
Home filed Form 1045, Application for Tentative Carryback Adjustment, claiming an overassessment and overpayment of income tax for the taxable year ended August 31, 1959, in the amount of $13,356.57, due to the carryback of the net operating loss incurred in the year ended August 31, 1962. On January 4, 1963, a tentative overpayment was allowed by the district director and a refund of income tax for the taxable year ended August 31, 1959, in the amount of $13,356.57 was made to Home. For the taxable year ended August 31, 1963, Home reported a net operating loss of $210,744.60, computed as follows: Taxable Income (before net operating loss deduction)
$580,943.28
Less: Dividends Received Deduction
791,687.88
Net Operating Loss
$210,744.60
Home filed Form 1045, Application for Tentative Carryback Adjustment, claiming an overassessment and overpayment of income tax for the taxable year ended August 31, 1960, in the amount of $109,587.20, due to the carryback of the net operating loss incurred in the year ended August 31, 1963. On December 13, 1963, *326 a tentative overpayment was 71 allowed by the district director and a refund of income tax for the taxable year ended August 31, 1960, in the amount of $109,587.20, plus interest of $1,859.98 was made to Home. In his notice of deficiency with respect to the petitioner's taxable years ending August 31, 1962, and 1963, respondent disallowed the above-mentioned deductions taken for bad debts and worthless stock. Respondent also disallowed the deduction of $8,421.97, in the year ending August 31, 1960, as a net operating loss carryback resulting from the deductions in issue herein claimed for the year ended August 31, 1963. With the exception of this amount, the carrybacks to the years ended August 31, 1959 and August 31, 1960, have been eliminated from issue herein as a result of the partial settlement for the years ended August 31, 1962 and August 31, 1963. ULTIMATE FINDINGS OF FACT 1. Each one of the notes and accounts receivable acquired by Home in the March 31, 1962 reorganization was only partially worthless on that date; respondent improperly considered some of those debts as "completely worthless" when acquired by petitioner. 2. Petitioner knew that the stock in the Rawleigh *327 subsidiaries which it acquired in the March 31, 1962 reorganization (and later charged off as wholly worthless) became wholly worthless at some undisclosed time prior to the reorganization. 72 OPINION The issues presented for our decision are whether petitioner's predecessor, Home Finance Group, Inc., is entitled to deductions for bad debts under section 166(a) (1) [7] and losses from worthless stock under sections 165(a) and (g) [8] *328 *329 73 in the taxable years ending August 31, 1962, and August 31, 1963. The deficiency determined with respect to the taxable year ending August 31, 1960, results from respondent's disallowance of a portion of the carryback of claimed net operating loss incurred in the fiscal year ending August 31, 1963. Whether such a loss occurred to the extent of the carryback disallowed will depend upon our determination with regard to the latter year, and the parties have agreed that the matter of the 1960 deficiency will be settled on the Rule 50 computation. 74 During 1961, Home owned a large number of subsidiaries which were in the automobile finance and consumer loan business. Although Home had not engaged in the commercial factoring business prior to 1961, Home's management had for some time discussed the need for entering into such a business. In August of 1961, Home became interested in acquiring Rawleigh-Parent, a corporation controlled by Standard. The bulk of the Rawleigh-Parent assets consisted of notes and accounts receivable due from its seven wholly owned subsidiary corporations [9] and of the stock in those subsidiaries. After studying the consolidated financial statements pertaining to these companies, Home determined that they appeared to be a profitable business group, and that a tax-free merger of some *330 sort with Rawleigh-Parent would be desirable. On September 8, 1961, Home, Standard, and Rawleigh-Parent executed an agreement to carry out the above-mentioned merger. However, neither the exact type of merger (both a purchase of the Rawleigh-Parent stock and a "practical" merger had been discussed) nor 75 the amount of Home stock which was to be transferred (either to Rawleigh-Parent or to its stockholders) was conclusively determined in this agreement. Although Home would transfer no more than one and one-half shares for every share (or its asset equivalent) of Rawleigh-Parent, it was provided that if the consolidated book value of Rawleigh-Parent on March 31, 1962, was determined to be less than that which was represented on its books as of September 8, 1961, then the "exchange ratio" would be adjusted downward accordingly. It was also provided that Home would take over the *331 management of the Rawleigh companies during the period prior to the merger. During that time, it was anticipated that Home would have an opportunity to determine the true asset value of the subsidiaries of Rawleigh-Parent and thereby determine a realistic book value for Rawleigh-Parent's debt due from its subsidiaries and for the stock which it held in those subsidiaries. Soon after this agreement was executed, Home took over the management of the Rawleigh companies and began an intensive study of the notes and accounts receivable (which constituted the bulk of the assets) owned by the Rawleigh subsidiaries. 76 The Home representatives found that the amounts provided in the subsidiaries' "Allowance for Losses" (reserve for bad debts) accounts were grossly understated, and they consequently increased these accounts from an aggregate of $184,824 to $1,425,000 on the consolidated balance sheet for the month of September 1961. The book value of each of the subsidiaries was thereby decreased to a level of substantial insolvency. Shortly thereafter, with the exception of the P.C.S., Inc. subsidiary, the Rawleigh companies were audited by an independent C.P.A. for the six-month period *332 ending September 30, 1961, and the above increases in reserves for bad debts were said to be "deemed necessary for the current year." On December 14, 1961, representatives of Home and Standard held a meeting at which they decided that the final exchange ratio should be determined at that time and that they would not wait to see what the consolidated book value of the Rawleigh companies would be on March 31, 1962. It was decided that the ratio should be six-tenths of a share of Home for each outstanding share of Rawleigh-Parent and that a "practical" merger would be effected on March 31, 1962, pursuant to which Home would take over all of Rawleigh-Parent's assets and liabilities in return for Home's stock. Rawleigh-Parent would then distribute the Home stock to the Rawleigh stockholders in return for 77 their Rawleigh stock in accordance with the above-mentioned exchange ratio. An amendment to the September 8, 1961 agreement was executed on January 8, 1962, to effect the above changes in the contract. In accordance with the amended agreement, the reorganization was carried out on March 31, 1962. Although it was clear that each note and account receivable due from the individual Rawleigh *333 subsidiaries was partially worthless and that the stock in those subsidiaries was totally worthless, Home recorded the face value of each of these items on its books on the ground that the basis of each item in the hands of the transferor (Rawleigh-Parent) carried over to Home due to the tax-free nature of the reorganization. On August 20, 1962, Home liquidated the two consumer factoring subsidiaries, Piedmont Assets and P.C.S., Inc. The assets received by Home in the liquidations satisfied only a portion of the total indebtedness due from each of those subsidiaries. The stock which Home held in these subsidiaries was, of course, worthless. In its income tax return for the taxable year ended August 31, 1962, Home deducted the amount of the unrecovered debts as a bad debt loss, and Home also deducted the face value of the stock in each of the subsidiaries as an ordinary loss from worthless stock. 78 Soon after the March 31, 1962 reorganization, all of the commercial factoring subsidiaries were merged into the J. N. Rawleigh Company of North Carolina. The latter subsidiary took over all of the assets and liabilities of the other commercial factoring subsidiaries in a tax-free practical *334 merger. On November 1, 1962, the J. N. Rawleigh Company of North Carolina sold all of its assets to another Home subsidiary, Home Factors Corporation. The latter company assumed all of the known liabilities of J. N. Rawleigh Company of North Carolina except the notes and accounts payable to Home. On December 23, 1962, Home liquidated the J. N. Rawleigh Company of North Carolina and recovered only a part of the total indebtedness due to Home. As in the case of the consumer factoring subsidiaries mentioned above, nothing was received with respect to the stock. In its income tax return for its taxable year ended August 31, 1963, Home took a bad debt deduction for the amount of unrecovered debt and an ordinary loss deduction for worthless stock. We shall first consider the question of whether Home was entitled to the bad debt deductions in issue. Respondent conceded on brief that Home's principal purpose in acquiring the assets (which included debts and stock) of Rawleigh-Parent was not evasion or avoidance of Federal income tax within the purview of section 269. Also, 79 respondent does not contest petitioner's premise that Home acquired these assets in a tax-free Type C reorganization *335 under section 368(a) (1) (C). [10] * * * Although it is not entirely clear, respondent appears to be urging that we consider the debts acquired in the reorganization as being divided into valuable debts on the one hand and totally worthless debts on the other hand. This contention is apparently based upon the ground that each subsidiary did not have enough assets to satisfy the whole bundle of debts which it owed at the time of the reorganization; to 80 the extent that a number of these debts could *336 not have been satisfied if payment had been forced on March 31, 1962, the respondent believes the debts should be considered to have been totally worthless on that date. Respondent concludes that, since the latter debts were "wholly worthless" in the hands of Rawleigh-Parent, they should have been charged off at some time prior to the reorganization and the deduction is therefore not available to petitioner in a subsequent year. In this regard, respondent cites the well-known rule that a taxpayer is not entitled to a bad debt deduction unless the debt had some intrinsic value at the beginning of the taxable year and unless it actually became worthless during that year. Section 166(a) (1). Respondent then contends that the basis of these debts in the hands of Rawleigh-Parent on March 31, 1962, was zero and that Home only received a zero basis as a transferee of these purportedly worthless debts under section 362(b). [11] *337 81 Respondent also relies upon the rule that a deduction may not be had for a debt that was worthless when acquired. Eckert v. Burnet, 283 U.S. 140 (1931). He also cites Kinkead v. Commissioner, 71 F. 2d 522 (C.A. 3, 1934), for the proposition that inasmuch as a debt, worthless when acquired, adds nothing to the assets of a creditor, there is nothing to be charged off. We cannot agree with respondent's contention that the notes and accounts receivable due from the Rawleigh subsidiaries should be divided into those which were valuable and those which were "totally worthless" at the time of the reorganization. A similar argument was rejected by the Second Circuit in American Cigarette & Cigar Co. v. Bowers, 92 F. 2d 596 (C.A. 2, 1937). There the Commissioner argued that since the debt was in the form of a number of notes and since the debtor's business had been *338 patently dying for a number of years, the notes should have been progressively "ascertained" to be worthless and charged off by the creditor taxpayer in prior taxable years. The Court held that the statute did not impose a duty upon such a creditor to appraise the 82 assets of its debtor each year and to marshal the notes against the deficiency for that year. The Court also stated (92 F. 2d at 597): Each note was a separate debt and entitled to its proper dividend upon liquidation. A creditor may indeed allocate all that he receives upon one note until it is extinguished, but nothing compels him to do so; in the absence of any agreement to the contrary he may apply payments as he pleases. * * *
Following the above line of reasoning, we think that the record in the instant case clearly supports our finding that the individual notes and accounts receivable acquired by Home in the reorganization were only partially worthless at that time. Rawleigh-Parent was under no statutory obligation to take a deduction for partially worthless debts prior to the reorganization and did not choose to do so. As the Fourth Circuit stated in Reed v. Commissioner, 129 F.2d 908, 912 (C.A. 4, 1942): [The *339 creditor taxpayer] has a choice of charging off the amount he has determined to be bad and taking a partial bad debt deduction for that calendar year, or waiting until some future event definitely fixes the exact amount of his loss.This is entirely at the taxpayer's option. * * * Since Rawleigh-Parent had never taken a deduction for bad debts or otherwise lost its opportunity to do so, we think that the basis of the debts in the hands of Rawleigh-Parent on March 31, 1962, was the original cost basis of those assets. Petitioner claims that cost basis as its own and 83 relies upon the general rule that the transferor's basis in property acquired in a section 368 reorganization carries over into the hands of the transferee under section 362(b). This rule has been applied with respect to the transfer of partially worthless debts under the predecessors of sections 368 and 362. Los Angeles Shipbuilding & Drydock Corporation v. United States, 166 F. Supp. 914 (S.D. Cal. 1958), vacated and remanded on another issue 289 F.2d 222 (C.A. 9, 1961). We see no reason why the same rule should not apply in the instant case to allow the bad debt deductions in issue herein. We think that respondent's *340 reliance on Eckert v. Burnet, supra, and Kinkead v. Commissioner, supra, is misplaced. Both of those cases involved acquisitions with respect to which the Code specifically provided that the taxpayer be given his own new basis (cost in Eckert, and fair market value at the time of the acquisition in Kinkead) in the acquired debt. It was found in both cases that the debts had no value when they were purportedly acquired, and that the taxpayers had not really received anything to which a basis could be ascribed. Under such circumstances it has also been held that the consideration given for the worthless debt 84 was more in the nature of a gift, Hoyt v. Commissioner, 145 F.2d 634 (C.A. 2, 1944); a contribution to capital, Fred A. Bihlmaier, 17 T.C. 620 (1951); or consideration paid for a potential bad debt deduction, Mountain Wholesale Co., 17 T.C. 870 (1951). The same principles underlying the above decisions have also been applied with respect to the purchase of a partially worthless debt. This Court has held that when a taxpayer purchases a debt with no reasonable hope of collecting the full face amount but only a portion thereof, then no bad debt deduction is allowed where the *341 taxpayer later receives full value for that part of the claim which he might reasonably have hoped to collect. Caroline D. Thompson, 22 T.C. 507 (1954). We do not think that the above cases apply to the instant case since Home did not "purchase" the debts as the taxpayer did in Thompson, supra, but merely received them as a transferee in a Type C tax-free reorganization under section 368. In the case of a "purchase," the taxpayer acquiring an asset obtains a new basis which has no necessary relation to the basis which the asset had in the hands of its former owner. The reorganization which took place here was not a taxable event with a concomitant reassignment of basis such as would have been 85 the case if an ordinary sale of assets had occurred. In this regard, section 1.368-1(b) of the Income Tax Regulations states, in part, as follows: Under the general rule, upon the exchange of property, gain or loss must be accounted for if the new property differs in a material particular, either in kind or in extent, from the old property. The purpose of the reorganization provisions of the Code is to except from the general rule certain specifically described exchanges incident to such *342 readjustments of corporate structures made in one of the particular ways specified in the Code, as are required by business exigencies and which effect only a readjustment of continuing interest in property under modified corporate forms. * * * Since the instant case involved a mere "readjustment of continuing interest in property under modified corporate forms" (a Type C reorganization), the Code provides in section 362(b) that the property acquired by Home, the transferee, in the reorganization takes a "carryover" basis equal to the basis in the hands of the transferor, Rawleigh-Parent. Congress enacted the carryover basis provisions of section 362(b), in part, to allow for the nonrecognition and postponement of loss on assets acquired in a "reorganization" which have decreased in value below the amount of the transferor's basis therein. We think that a holding for the respondent on this issue would frustrate the purposes of the statute. It would force 86 transferor taxpayers in similar situations to charge off their partially worthless debts prior to entering into a reorganization. Such a holding would frustrate the rule of Reed v. Commissioner, supra, which gives a taxpayer *343 creditor the option to charge off a partially worthless debt or wait until some furture event definitely fixes the exact amount of the loss. We must conclude that the petitioner correctly acquired Rawleigh-Parent's cost basis (the full face value) in the debts acquired in the reorganization. Since there is no issue with respect to the amount of the bad debt deductions taken in the petitioner's taxable years ending August 31, 1962 and 1963, we hold that the bad debt deductions taken in those years were proper. We turn now to the question of whether respondent properly disallowed petitioners' deductions under sections 165(a) and (g) for losses on worthless stock in certain subsidiaries in the taxable years ending August 31, 1962 and 1963. On brief petitioner conceded that the alleged losses were deductible, if at all, as capital losses, and not as ordinary losses because petitioner admittedly did not establish that more than 90 percent of the gross receipts of the subsidiaries for all taxable years was from sources other than interest, rents, or certain other specific sources described by section 165(g) (3). 87 Section 165(g) generally provides that the loss resulting from any security *344 which is a capital asset which becomes worthless during the taxable year shall be treated as a loss from the sale or exchange of a capital asset. Section 1211(a) limits the deduction of such a loss to the extent of gains from the sales or exchanges of capital assets. The record in the instant case clearly indicates that Home had a net capital gain from such sales or exchanges of only $189.52 in its taxable year ending August 31, 1962, and had no net capital gain at all in the following taxable year. Therefore, if any capital loss would be available to the petitioner in this case, it would be only to the extent of $189.52 in its 1962 taxable year. We have found that the petitioner has completely failed to sustain its burden of proving that the stock in the subsidiaries became worthless in the years in which the deductions were taken. On the contrary, we think that the record clearly supports our ultimate finding that the subsidiaries were hopelessly insolvent prior to their acquisition by Home on March 31, 1962, and that the stock in those subsidiaries was completely worthless prior to that time. Since section 166(g) allows a deduction for capital losses from worthless stock only *345 in the taxable year in which they become 88 worthless, we conclude and hold that petitioner is not entitled to the deductions claimed in the subsequent taxable years. This result is in accord with our holding in Seaboard Commercial Corporation, 28 T.C. 1034, (1957). Petitioner argues for the first time on brief that, even if the stock with respect to which deductions were taken was worthless when acquired, it became worthless in Rawleigh-Parent's last taxable year ending March 31, 1962, and that, since Rawleigh-Parent had no net capital gain in that year, Home was entitled to a section 1212 capital loss carryover [12] under sections 381(a) (2) and 89 (c) (3). [13] *347 *348 Since this question was not raised by the pleadings, in the opening statements, or during trial, we do not think that it constitutes an issue for our determination.Respondent did not admit that the stock became worthless 90 in Rawleigh-Parent's last taxable year, but only that it became worthless at some time prior to petitioner's acquisition thereof. It is possible, therefore, that if the issue had been properly raised by petitioner, respondent might have argued that the stock became worthless in some previous year in which *346 Rawleigh-Parent had net capital gains to offset the losses at issue. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise noted, all statutory references are to the 1954 Internal Revenue Code↩, as amended. 1. The amount owed by Rawleigh-Parent on its notes payable increased from approximately $4,000,000 to $8,114,000 in the 12-month period from March 31, 1960 to March 31, 1961. The increase in accounts receivable purchased is directly related to this increase in debt. ↩
2. According to the balance sheets attached to the income tax returns filed with respect to the Rawleigh subsidiaries for the year ending March 31, 1961, the subsidiaries had a total of $11,114,431.88 in aggregate amount of notes and accounts receivable, with a total allowance for losses of $156,367.31. On the other hand, the independent C.P.A. audit report for March 31, 1961, shows aggregate receivables of $11,313,299 and total allowances for losses of only $148,036. The record does not reveal the reason for these discrepancies. With the exception of Piedmont Customer Service and Piedmont Assets, the audit report failed to show the amounts of receivables and reserves with respect to each individual subsidiary. These amounts were reported on the tax returns as follows: Rawleigh-N.C., Rawleigh-Fla., Rawleigh-Ky., Rawleigh-S.C., Piedmont Customer Service, and Piedmont Assets, had total receivables of $4,984,341.34, $1,302,465.68, $3,731.33, $990,096.84, $3,078,929.71, and $754,866.98, respectively, and allowances for losses (reserves for bad debts) of $77,958.10, $28,962.75, none, $14,381.69, $35,064.77, and none, respectively. 3. According to the stipulated facts, this conference appears to have been some time during the first week of September 1961. We note, however, that there is some evidence indicating that this conference took place on August 28 or 29, 1961. ↩
4. Rawleigh-Parent treated Rawleigh-Kentucky and Rawleigh-South Carolina as a unit for accounting purposes, and referred to its stock and receivables due from these subsidiaries as either "J. N. Rawleigh, Ky." or "J. N. Rawleigh, Ky. (S.C.)." ↩
5. After Home issued additional shares to effect the merger with Rawleigh-Parent which later took place on March 31, 1962, the directors and their families still owned more than half of the total outstanding shares of Home. ↩
a1. As previously noted, Rawleigh-S.C. and Rawleigh-Ky. were treated as a unit on the Rawleigh-Parent books under the name Rawleigh-Ky. (S.C.). Rawleigh-S.C. had actually owed Rawleigh-Parent $1,314,431.09 prior to March 31, 1962; Rawleigh-Parent had owed Rawleigh-Ky., $4,567.67. Instead of treating the $4,567.67 as a liability, Rawleigh-Parent merely offset that amount against the $1,314,431.09 debt due from Rawleigh-S.C., and recorded a total debt due of only $1,309,863.42. The latter amount was placed on Home's books as an asset after the closing. Rawleigh-Ky. was dissolved soon thereafter in a tax-free exchange under section 332, I.R.C., 1954↩. a2. Although the Rawleigh-Parent balance sheet for March 31, 1962, indicates a total debt due from Piedmont Building in the amount of $174,784.54, the balance sheet for the latter subsidiary indicates an additional "Account Payable-Parent" in the amount of $176,352.04. For reasons undisclosed by the record, Home did not treat the additional $1,567.50 as an asset received on the acquisition. 6. Although the parties have agreed that the fair market value of these shares was about $1,400,000, it should be noted that the market price of Home's common voting stock on March 31, 1962, ranged from a low of $16.625 to a high of $17.375 per share. If the mean between the high and low prices, or $17 per share, was used as the sole criterion of value, the 81,403 shares would only have been valued at $1,383,851. a1. In this instance the specific bad debts charged off actually exceeded the amount in the bad debt reserve account by $18,022.23. a1. [This total is inaccurate but is stated here as it appears in the contract. The correct total is $4,039,313.77.] ↩
a2. [The amounts of the "liabilities assumed" are the same as those which appeared on the Rawleigh-N.C. books with respect to the items listed.] 7. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * ↩
8. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; * * * (3) Securities in Affiliated Corporation. - For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if - (A) at least 95 percent of each class of its stock is owned directly by the taxpayer, and (B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, and gains from sales or exchanges of stocks and securities. In computing gross receipts for purposes of the preceding sentence, gross receipts from sales or exchanges of stocks and securities shall be taken into account only to the extent of gains therefrom. ↩
9. The seven subsidiaries have been described hereinabove as four commercial factoring corporations (Rawleigh-N.C., Rawleigh-Fla., Rawleigh-Ky., Rawleigh-S.C.), two consumer factoring corporations (P.C.S., Inc. and Piedmont Assets), and the corporation which held real estate (Piedmont Building Corporation). ↩
10. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization. - (1) In General. - For purposes of parts I and II and this part, the term "reorganization" means - * * * (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; ↩
11. SEC. 362. BASIS TO CORPORATIONS. * * * (b) Transfers to Corporations. - If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stocks or securities in a corporation a party to the reorganization, unless acquired by the exchange of stock or securities of the transferee (or of a corporation which is in control of 12. Section 1212 read as follows prior to the Tax Reform Act of 1969: SEC. 1212. CAPITAL LOSS CARRYOVER. (a) Corporations. - (1) In general. - If for any taxable year a corporation has a net capital loss, the amount thereof shall be a short-term capital loss - (A) in each of the 5 succeeding taxable years, or (B) to the extent such loss is attributable to a foreign expropriation capital loss, in each of the 10 succeeding taxable years, to the extent such amount exceeds the total of any net capital gains (determined without regard to this paragraph) of any taxable years intervening between the taxable year in which the net capital loss arose and such succeeding taxable year. ↩
13. SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS. (a) General Rule. - In the case of the acquisition of assets of a corporation by another corporation - * * * (2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) (but only if the requirements of subparagraphs (A) and (B) of section 354(b) (1) are met), or (F) of section 368(a) (1), the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c). * * * (c) Items of the Distributor or Transferor Corporation. - The items referred to in subsection (a) are: * * * (3) Capital Loss Carryover. - The capital loss carryover determined under section 1212, subject to the following conditions and limitations: (A) The taxable year of the acquiring corporation to which the capital loss carryover of the distributor or transferor corporation is first carried shall be the first taxable year ending after the date of distribution or transfer. (B) The capital loss carryover shall be a short-term capital loss in the taxable year determined under subparagraph (A) but shall be limited to an amount which bears the same ratio to the net capital gain (determined without regard to a short-term capital loss attributable to capital loss carryover), if any, of the acquiring corporation in such taxable year as the number of days in the taxable year after the date of distribution or transfer bears to the total number of days in the taxable year. (C) For purposes of determining the amount of such capital loss carryover to taxable years following the taxable year determined under subparagraph (A), the net capital gain in the taxable year determined under subparagraph (A) shall be considered to be an amount equal to the amount determined under subparagraph (B). ↩